## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION NO.** |
| **Plaintiff,** | **1:19-CR-389-LMM-CCB** |
| **v.** | |
| **RAHEEM JAMAL MORRIS,** | |
| **Defendant.** | |

### FINAL REPORT AND RECOMMENDATION

Defendant Raheem Jamal Morris is charged with conspiring to possess with the intent to distribute methamphetamine (Count 1) and possessing with the intent to distribute methamphetamine (Count 9). (Doc. 231). He filed a motion to suppress evidence seized from a warrantless search of a car that he was driving on July 29, 2019. (Doc. 162). The Court held an evidentiary hearing, (Doc. 316), and the parties have filed post-hearing briefs, (Docs. 345, 351, 427). For the reasons set forth below, the undersigned **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

I.     **Facts**

    A.     **Events Leading Up to the Traffic Stop**

      DEA Special Agent Kimbrell Dodder testified about an investigation that he and other agents conducted between April and August of 2019 during which they monitored two phones located inside Georgia prisons that were used to coordinate outside drug transactions. (Doc. 316 at 6). On July 28, 2019, agents intercepted phone conversations between someone named Ralo (who was inside a prison) and someone named "Black" (who was on the outside and who was later identified as the Defendant). *Id.* at 7–8.[1] Through these conversations, agents learned that a drug shipment was on its way to a hotel in Douglasville, Georgia, and that the drugs were going to be transported in a Nissan Rogue with Nevada license plates. *Id.* at 8–10.

      The next day, July 29, agents set out in Douglasville to look for the Rogue. *Id.* at 10. It was not at the hotel where the delivery was supposed to occur. *Id.* But around 8:40 in the morning the agents did see a blue Nissan Rogue with Nevada

---

[1] During the latter part of their investigation, agents began intercepting someone known as "Black" who was talking to an inmate known only as "Ralo" about conducting drug deals in Douglasville. (Doc. 316 at 7). Agents did not know that "Black" was Defendant Raheem Morris during the course of the phone calls that they intercepted on July 29 and which are discussed below. *Id.* at 23.

license plates at 3 Roper Drive—a residence where they suspected that "Black" lived. *Id.*[2] The agents saw Defendant at the location as well, and they set up surveillance in the area. *Id.* at 10–11; Gov. Exh. 2.

In either the late morning or afternoon, agents learned through intercepted calls that a drug transaction was about to take place. (Doc. 316 at 12). Specifically, they overheard that "Black" (driving a Hyundai) was to deliver a kilogram of methamphetamine to a customer (who would be driving a Cadillac) at the Food Depot and that the buyer would be at the grocery store within 30 minutes. *Id.* at 12–13. Around the time that the customer was supposed to be at the meeting location, agents saw Defendant exit 3 Roper Drive carrying a white plastic bag with black writing, get into a Hyundai sedan, and drive to the Food Depot. *Id.* at 14; Gov. Exh. 4. There the agents saw someone get out of a black Cadillac, get into the passenger seat of Defendant's Hyundai, exit the Hyundai carrying a white bag with black writing, re-enter the Cadillac, and leave. (Doc. 316 at 14; Gov. Exhs. 5–6). Following this suspected drug transaction, agents continued surveillance. (Doc. 316 at 16).

---

[2] The Rogue was registered to a rental-car company. (Doc. 316 at 26).

Later that same day, agents saw Defendant walk out of 3 Roper Drive carrying a trash bag. *Id.* Defendant got into the blue Nissan Rogue, drove to the Food Depot, and threw a white trash bag into a dumpster. *Id.* at 16–17. Agents retrieved the bag from the dumpster and found plastic wrap of the type that is commonly used to package drugs, as well as some apparent residue that later tested positive for methamphetamine. *Id.* at 17.

In the afternoon of July 29 agents learned through intercepted calls of another pending drug transaction, again involving one kilogram of methamphetamine, that was again to occur at the Food Depot. *Id.* at 18. At 5:46 p.m. the surveilling agents were informed by others working in the "wire room" of a monitored phone call saying that the customer was at the Food Depot. *Id.* at 28. Agents were informed of a monitored call in which "Black" said that he was leaving, and at 5:51 p.m. agents saw Defendant leave 3 Roper Drive carrying a bag or an object, get into the Hyundai, and drive in the direction of the Food Depot. *Id.* at 18, 28.

**B.     The Traffic Stop**

Prior to July 29, agents had coordinated over five traffic stops throughout this investigation that resulted in them seizing methamphetamine. *Id.* at 19. Anticipating a similar course of action, the agents had made arrangements with

4

the Douglas County Sherriff's Office (DCSO) to have officers in the area on July 29 to assist with a traffic stop in the event of a suspected drug transaction. *Id.* at 18–20. On July 29, Special Agent Dodder spoke with DCSO Sergeant Ryan Cadwell by phone, generally informed Cadwell of the drug investigation, and gave him the description of the car Defendant would be driving and the location of where he was going. *Id.* at 20. Sergeant Cadwell testified that DEA contacted him during the morning of July 29 to let him know that they were surveilling a target and might need a vehicle stopped. *Id.* at 30. Cadwell had multiple calls with DEA over the course of the day, through which he learned that the suspected transaction would involve a large quantity of methamphetamine, the type of car that the suspect would be driving, and that the driver would be heading towards the Food Depot on Highway 5. *Id.* at 30–32.[3] Sergeant Cadwell, in turn, relayed this information to DCSO Deputy Jonathan Britt, who was assigned to stop the vehicle. *Id.* at 30. In the event of a traffic stop, Sergeant Cadwell would serve as back-up and as the canine handler. *Id.* at 30–31.

Deputy Britt testified that Sergeant Cadwell informed him that DEA was investigating a vehicle that might be transporting methamphetamine. *Id.* at 36.

---

[3] Sergeant Cadwell was not given a description of the driver. (Doc. 316 at 30).

5

Britt was located less than a half mile from 3 Roper Drive, where he awaited further information. *Id.* at 37, 70–71. He was informed that the vehicle in question was a black Hyundai Sonata (he could not recall if he was given a license plate number) that would be traveling north to the Food Depot, and he was told when the vehicle left the residence on Roper Drive. *Id.* at 37–38.

When Britt learned that the vehicle had left Roper Drive, he moved his car (he had been parked out of sight along Highway 5) and immediately saw a Black Hyundai approaching Highway 5. *Id.* at 37, 71. He did not see any other Black Hyundais in the area. *Id.* at 71. The Hyundai turned left to go north on Highway 5, which is the direction of the Food Depot. *Id.* at 38. Deputy Britt pulled in behind the Hyundai and observed two traffic infractions; the windows on the Hyundai appeared to have too dark of a tint, and it was following the vehicle in front of it too closely. *Id.* at 39.

Deputy Britt stopped the vehicle and, after asking Defendant several times to take his foot off the brake, made contact with Defendant at 17:55:31.[4] The

---

[4] The Government submitted a recording of the traffic stop as an exhibit at the suppression hearing. (Gov. Exh. 8). The Court attempted to watch the video on the disc provided by the Government but was unable to do so. The parties subsequently provided the Court with a copy of five video recordings, four of which are of the traffic stop and subsequent search, and one of which appears to be a video of a white-colored wall (perhaps from a dash cam inside of a garage)

deputy asked Defendant for his license, which Defendant did not have. Deputy Britt asked Defendant to write down his information on a piece of paper, inquired whether Defendant knew the window tint, and measured the window tint with a handheld device (it measured at 29%, which he told Defendant violates Georgia law).[5] The deputy handed Defendant a piece of paper and a pen to write down his information, told him that he was going to give Defendant a warning, and further explained that Defendant was following too closely to the SUV that was in front of him. The two discussed the following distance, including the prevalence of rear-end collisions; the deputy reiterated that he was going to give Defendant a written warning; and he asked Defendant to step out of the vehicle while he wrote the warning. This portion of the conversation lasted until approximately 17:57:45.

Between 17:57:45 and 17:58:12, Defendant walked to the rear of his vehicle, the deputy asked if he had any weapons (Defendant said he did not), and Deputy

---

that records nothing of apparent relevance. The time stamps from the recordings of the traffic stop do not exactly match, presumably because the time setting on the various recording devices was different. The Court uses the times from the first video (labeled "Jonathan Britt BC259 2019-07-29 17:54:54") and details the times to give an accounting for how long the various parts of the conversation lasted. The Court has marked the recordings provided by the parties after the hearing as Court's Exhibit One.

[5] Defendant does not dispute that there was, in fact, a window-tint violation. (Doc. 316 at 69).

Britt walked to his patrol car to retrieve a warning pad. The following is a summary of the remainder of their conversation:

- 17:58:12—Deputy Britt (who returned from his vehicle and is standing next to Defendant) asked Defendant if he had been working out and commented on the amount that Defendant was sweating. Deputy Britt asked Defendant where he was going, and Defendant stated that he was on the way to the store to get alkaline water. For several seconds, they discussed alkaline water. Through this portion of the conversation it appeared that the deputy was opening his pad preparing to write the warning, and by 17:58:37 it is clear that he began to write the warning.

- 17:58:37—Deputy Britt was writing the warning. While doing so, the two continued to discuss alkaline water; Deputy Britt asked who owned the car (Defendant told him that it was Wendy's car); and the deputy asked for Defendant's license number, his full name, his address, and where he was coming from. He asked if Defendant's license was valid and whether he was on probation or parole.

- 18:00:21—Deputy Britt, while still writing the warning, asked Defendant if he had any warrants and commented that Defendant appeared "extremely nervous." Defendant said that he was sweating because it was hot, and the

8

deputy asked if there was "anything going on outside of the equipment violations that I stopped you for?" Defendant said "no" and the deputy asked for the year of the car and wrote down the vehicle's tag number.

- 18:01:06—Deputy Britt continued to write the warning and asked Defendant for consent to search the vehicle. Defendant refused, and Deputy Britt asked Defendant to move slightly away from the car and closer to the patrol vehicle while he signaled to Sergeant Cadwell to approach with the canine.

- 18:01:19—18:01:37—No conversation occurred while Deputy Britt continued to write the warning.

- 18:01:37—Deputy Britt asked Defendant to move further away from the car, and the canine handler is seen walking toward Defendant's car with his dog. Deputy Britt continued to write the warning, and Sergeant Cadwell asked if there were drugs in the car (Defendant said no).

- 18:02:14—Deputy Britt told Defendant to "hold tight," stopped writing the warning, and walked over to the vehicle and began searching. The deputy commented on the smell of air freshener and asked Defendant what the "baggies" were for.

9

- 18:03:38—Deputy Britt instructed Defendant to get on the ground and placed Defendant in handcuffs. By 18:05:25, Defendant was seated in the back seat of the patrol car.

All told, it was approximately 8 minutes and 7 seconds from when Deputy Britt first made contact with Defendant until Defendant was placed in handcuffs.

Sergeant Cadwell testified that after he arrived on the scene, he walked his canine around the car and the dog alerted to the presence of narcotics by trying to jump through the passenger side window. (Doc. 316 at 32–33).[6] Deputy Britt testified about a number of things that he noticed about Defendant that made him suspicious, including a very strong odor of air freshener coming from the car, which he explained is often used to conceal the smell of narcotics. *Id.* at 40. He also noted that Defendant was sweating profusely, that Defendant laughed at unusual times, that Defendant's hands were trembling, that Defendant's heart was beating so fast that the deputy could see it through his shirt, that Defendant offered a non-sensical explanation for why he was sweating, that Defendant gave an unusually long explanation regarding the alkaline water that he drinks, and that Defendant raised his arms as if to be searched when Deputy Britt asked him

---

[6] The dog is trained to detect the odor of marijuana, methamphetamine, cocaine, and heroin. (Doc. 316 at 33).

if he had any weapons. *Id.* at 40–48. The combination of these perceived oddities led the deputy to believe that Defendant was excessively nervous and that Defendant had something in the car that he did not want the deputy to find. *Id.* After the dog alerted, Deputy Britt searched the vehicle and found small, clear bags that he explained are commonly used to package narcotics, as well as one kilogram of methamphetamine. *Id.* at 48–49.

Deputy Britt confirmed that the traffic stop took place late in the day during July, one of the hotter months of the year. *Id.* at 60. He also agreed that Defendant was a "big guy," that someone's physical condition might impact how much that person sweats, and that he found no air freshener in the car. *Id.* at 60–62.

## II.    Analysis

Defendant moves to suppress the items recovered from the warrantless search of his car. (Doc. 162). He maintains that the deputy unlawfully prolonged the traffic stop beyond its legitimate mission (to write Defendant a warning for the window-tint violation) by engaging in questioning unrelated to the stop. (Doc. 162 at 2). He further argues that the deputy did not have probable cause to search. *Id.* at 3–4. The Government, in turn, argues that the deputy had probable cause to search the vehicle before the traffic stop even occurred based on the DEA's investigation that occurred earlier in the day. (Doc. 351 at 6–10). In making

11

this argument, the Government relies on a combination of the collective-knowledge doctrine (whereby the collective knowledge regarding the investigation can be imputed to the deputy) and the automobile exception to the warrant requirement. *Id.* The Government further maintains that the deputy did not unconstitutionally prolong the stop because he developed reasonable articulable suspicion during the course of his interaction with Defendant to believe that the vehicle contained drugs, and the canine alert provided probable cause to search. (Doc. 351 at 10–14). Defendant argues in reply that there was no probable cause to search the car before the stop because the agents never identified Defendant as a suspect prior to the date in question, never identified what drug or quantity of drug was allegedly transferred earlier on the date in question, never identified the driver of the Cadillac (the presumed purchaser in the transaction they observed), never learned what happened to the Cadillac after the transaction, and never offered testimony about who owned the house at 3 Roper Drive or that Defendant ever looked into the bag that agents saw him throw into the dumpster at the Food Depot. (Doc. 427 at 2–3). Defendant further argues that Defendant's alleged nervousness did not give the deputy reasonable suspicion to investigate beyond the basis for the stop and that the deputy

therefore unconstitutionally prolonged the stop by engaging in questioning unrelated to the traffic infractions. *Id.* at 3–8.

### A. Probable Cause Prior to the Stop

The Government argues that the deputy had probable cause to search the car for drugs even prior to the stop based on what the agents learned through the course of their investigation. Its argument relies on a combination of the automobile exception to the warrant requirement and the collective-knowledge doctrine.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To guarantee this right, the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). There are exceptions to the warrant requirement, however, including one for automobiles. "Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id.* (internal quotation marks omitted). "For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe

that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). "Probable cause exists when there is a fair probability that contraband or evidence will be found in the vehicle under the totality of the circumstances." *Id.* at 1300. "Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (internal quotation marks omitted).

Neither party disputes that the automobile was readily mobile, as agents observed Defendant drive it away from Roper Drive and Deputy Britt followed behind the moving car before he initiated the traffic stop. *See, e.g., United States v. Santana*, No. 1:17-CR-408-AT-RGV, 2018 WL 7283633, at *10 (N.D. Ga. Sept. 19, 2018) (finding that a car was readily mobile where the trooper followed the vehicle, pulled it over, and it stopped with no indication that it had ceased to be operational), *adopted by* 2019 WL 365743 (N.D. Ga. Jan. 30, 2019).

The second requirement for the automobile exception is that Deputy Britt had to have probable cause to believe that the vehicle contained contraband or evidence of a crime. As an initial matter, the Court agrees with the Government that it may consider the collective knowledge of the agents when determining whether Deputy Britt had probable cause to stop and search Defendant's car even

14

before he observed the window-tint violation. Indeed, Defendant does not contest the collective-knowledge component of the Government's argument. As the Eleventh Circuit has held, probable cause "exists where the facts and circumstances *within the collective knowledge of law enforcement officials*, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted and emphasis added). The collective-knowledge doctrine applies, however, only if the law enforcement officers "maintained at least a minimal level of communication during their investigation." *Id.* "Thus, where, like here, the Government proceeds on a 'collective knowledge' theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Kahn*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

Here the level of communication between the officers was sufficient for the Court to impute to Deputy Britt the collective knowledge of the group. The federal agents made arrangements with the DCSO to have deputies in the area on July 29 to assist with a traffic stop in the event of a suspected drug transaction. (Doc. 316

15

at 18–20). On that date, Special Agent Dodder spoke with Sergeant Cadwell by phone, generally informed Cadwell of the drug investigation, and gave him the description of the car Defendant would be driving and the location of where he was going. *Id.* at 20, 30. Cadwell had multiple calls with DEA over the course of the day, through which he learned that the suspected transaction would involve a large quantity of methamphetamine, the type of car that the suspect would be driving, and that the driver would be heading towards the Food Depot on Highway 5. *Id.* at 30–32. Sergeant Cadwell, in turn, relayed this information to Deputy Britt. *Id.* at 30, 36. Britt was informed that the vehicle in question was a black Hyundai Sonata that would be traveling north to the Food Depot, and he was told when the vehicle left the residence on Roper Drive. *Id.* at 37–38. This level of communication is entirely consistent with that of cases where other judges on this court have permitted the Government to rely on the collective-knowledge doctrine. *See, e.g., United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with Georgia State Patrol prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient minimal communications where DEA contacted

16

the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communications where the DEA contacted Georgia State Patrol for assistance, the trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018).

And based on the collective knowledge of the law enforcement agents, Deputy Britt had probable cause to stop and search Defendant's car regardless of any traffic violations. As noted above, DEA agents conducted an investigation between April and August of 2019 during which they monitored two phones located inside Georgia prisons that were used to coordinate outside drug transactions. (Doc. 316 at 6). On July 28, 2019, agents learned through recorded conversations between Ralo and Black that a drug shipment was on its way to a hotel in Douglasville, Georgia, and that the drugs were going to be transported in a Nissan Rogue with Nevada license plates. *Id.* at 8–10.

The next day, July 29, agents saw both Defendant and a blue Nissan Rogue with Nevada license plates at 3 Roper Drive—a residence where they suspected that "Black" lived. *Id.* In either the late morning or afternoon, agents learned through intercepted calls that "Black" (driving a Hyundai) was to deliver a kilogram of methamphetamine to a customer (who would be driving a Cadillac) at the Food Depot and that the buyer would be at the grocery store within 30 minutes. *Id.* at 12–13. The agents then observed events consistent with the drug transaction discussed on the wire. Around the time that the customer was supposed to be at the meeting location, agents saw Defendant exit 3 Roper Drive carrying a white plastic bag with black writing, get into a Hyundai sedan, and drive to the Food Depot. *Id.* at 14; Gov. Exh. 4. There the agents saw someone get out of a black Cadillac, get into the passenger seat of Defendant's Hyundai, exit the Hyundai carrying a white bag with black writing, re-enter the Cadillac, and leave. (Doc. 316 at 14; Gov. Exhs. 5–6). These events, again, are entirely consistent with the drug transaction described on the intercepted call and gave agents probable cause to believe that Defendant was "Black" and that he was distributing illegal drugs. The timing was as suggested by the intercepted call, the seller's car was as described, the buyer's car was as described, and the location matched what the agents heard on the wire.

Later that same day, agents saw Defendant walk out of 3 Roper Drive carrying a trash bag, get into the blue Nissan Rogue, drive to the Food Depot, and throw a white trash bag into a dumpster. *Id.* at 16–17. In the bag was plastic wrap of the type that is commonly used to package drugs, as well as some apparent residue that later tested positive for methamphetamine. *Id.* at 17. Defendant's conduct in throwing away the trash bag only furthered the agents' probable cause to believe that Defendant was engaging in the distribution of methamphetamine.

That brings us to the second drug transaction the agents learned of over the intercepted phone calls. In the afternoon of July 29 agents learned of a pending drug transaction, again involving one kilogram of methamphetamine, that was again to occur at the Food Depot. *Id.* at 18. At 5:46 p.m. the surveilling agents were informed by others working in the "wire room" of a monitored phone call saying that the customer was at the Food Depot. *Id.* at 28. Agents were then informed of a monitored call in which "Black" said that he was leaving, and at 5:51 p.m. agents saw Defendant leave 3 Roper Drive carrying a bag or an object, get into the Hyundai, and drive in the direction of the Food Depot. *Id.* at 18, 28. The second transaction was identical in all material respects to the one the agents learned of and then observed earlier in the day—the location was the same, the amount and type of drug were the same, "Black" was the seller in both, Black left the house

carrying a bag both times, and Black drove in the direction of the Food Depot both times in a Hyundai. This information gave agents ample probable cause to believe that Defendant (the person they spent the day surveilling) was Black, that Defendant was engaged in the sale of methamphetamine, and that evidence of that drug activity would be found in the car Defendant was driving. *See, e.g., United States v. Olvera*, 178 F. App'x 373, 374–75 (5th Cir. 2006) (affirming the district court's finding of probable cause to believe that the defendant was transporting cocaine based on interceptions of recorded phone calls and observation of defendant on the day of the suspected drug delivery); *United States v. Edenilson-Reyes*, No. 1:09-CR-361-RWS-AJB, 2010 WL 5620439, at *7–8 (N.D. Ga. Oct. 26, 2010) (finding probable cause based on conversations intercepted over the defendant's phone and subsequent observation of suspicious events that were consistent with the phone calls), *adopted by* 2011 WL 195679 (N.D. Ga. Jan. 20, 2011); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1339–40 (N.D. Ga. 2009) (finding probable cause based on intercepted phone calls, a prior search and seizure, and observations corroborating the details the agents learned from the calls); *United States v. Pineda*, No. 1:06-CR-350-WSD, 2008 WL 686239, at *10–11 (N.D. Ga. Mar. 10, 2008) (finding probable cause based on intercepted phone calls

20

suggesting that a drug transaction was going to take place and surveillance consistent with those calls).

Defendant points out that he was not identified as a person involved in drug transactions prior to the date in question, noting that his phone was not wiretapped and that agents were not surveilling his home or vehicles. (Doc. 427 at 2). That is true, but agents had previously intercepted calls involving "Black" and "Ralo" discussing drug deals in the Douglasville area, (Doc. 316 at 7), and the observations on July 29 gave the agents probable cause to believe that Defendant was "Black." Moreover, even without any prior information about "Black" or Defendant, the events of July 28 and 29 gave agents the probable cause they needed to search Defendant's car. The agents heard the details of a drug deal that was about to occur, observed Defendant act in a way entirely consistent with the notion that he executed that transaction, saw him later throw away drug contraband in a grocery store dumpster, intercepted calls suggesting that a nearly identical deal was in the works, and saw Defendant begin to execute the second transaction in the same way he behaved during the first. The fact that the intercepted calls came from someone else's phone, as Defendant argues, does not detract from the probable cause.

21

Defendant also argues that the agents lacked probable cause because they did not confirm that the first drug deal was, in fact, a drug deal. (Doc. 427 at 2). He notes that they never identified the driver of the Cadillac (the suspected buyer in the first observed transaction), never confirmed the type or quantity of drug that was exchanged, and never learned what happened to the Cadillac after the transaction. *Id.* Defendant seeks to impose a burden higher than probable cause, which requires only "reasonable probability and not certainty." *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (internal quotation marks omitted). Based on the intercepted calls and surveillance that corroborated the details transmitted in those calls, the agents had enough reasonably trustworthy information to "cause a prudent person to believe that the suspect has committed or is committing an offense." *Id.*

Finally, Defendant argues that the Government did not present testimony about who owned the house at 3 Roper Drive or evidence to establish that Defendant knew what was in the white trash bag that he threw away. (Doc. 427 at 2–3). Defendant's actions at 3 Roper Drive—regardless of who owned it—when coupled with the intercepted calls gave the agents probable cause to stop the car Defendant was driving. And although the Government did not present direct evidence to conclusively establish that Defendant knew the contents of the trash

22

bag, the fact that he drove it from 3 Roper Drive and threw it away in a publicly-accessible dumpster in a grocery store parking lot allows the Court to infer that he knew there was something in it that he did not want to be associated with. Moreover, this fact is just one of many that collectively establish a reasonable probability that Defendant was engaging in illegal drug activity. For all the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's motion to suppress be denied because agents had probable cause to stop and search the car Defendant was driving even before Deputy Britt observed any traffic infractions.

## B.   Whether Deputy Britt Unconstitutionally Prolonged the Traffic Stop

Because Deputy Britt had probable cause to stop the car Defendant was driving and search it for evidence of the drug transactions discussed over the intercepted calls, the undersigned declines to address Defendant's argument that the deputy unconstitutionally prolonged the stop by engaging in an investigation unrelated to the traffic violations. (Doc. 427 at 3–8.)

**III.    Conclusion**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motion to suppress, (Doc. 162) be **DENIED**. There are no other pretrial motions related to Defendant Raheem Jamal Morris pending before the undersigned, and his case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 10th day of November, 2020.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

24